Citation Nr: 1602949 
Decision Date: 01/29/16 Archive Date: 02/05/16

DOCKET NO. 10-36 299 ) DATE
 )
 )

On appeal from the
Department of Veterans Affairs Regional Office in St. Petersburg, Florida


THE ISSUE

Entitlement to service connection for a heart disability, to include rheumatic valvulitis.


REPRESENTATION

Appellant represented by: Disabled American Veterans


WITNESSES AT HEARING ON APPEAL

The Veteran and his wife


ATTORNEY FOR THE BOARD

C. J. Houbeck, Counsel


INTRODUCTION

The Veteran had active service from August 1952 to December 1952.

This matter comes before the Board of Veterans' Appeals (Board) on appeal from a September 2009 rating decision of the Department of Veterans Affairs (VA) Regional Office (RO) in St. Petersburg, Florida, which denied the claim on appeal.

The Veteran subsequently had a hearing before the undersigned Veterans Law Judge in April 2013. A transcript of that proceeding has been associated with the electronic claims file.

The Veteran's claim was remanded by the Board for additional development in May 2013. The Board subsequently denied the claim in an April 2014 determination. The Veteran appealed the Board's April 2014 decision to the United States Court of Appeals for Veterans Claims (Court). In a December 2014 Order, the Court granted a Joint Motion for Remand (JMR) vacating the Board's April 2014 decision and remanded the matter for action consistent with the terms of the joint motion. Thereafter, the Veteran's claim again was remanded by the Board in January 2015 and July 2015.

This appeal was processed using the Virtual VA and Veteran's Benefits Management System (VBMS) paperless claims processing systems. Accordingly, any future consideration of this appellant's case should take into consideration the existence of these electronic records.

This appeal has been advanced on the Board's docket pursuant to 38 C.F.R. § 20.900(c). 38 U.S.C.A. § 7107(a)(2) (West 2014).



FINDING OF FACT

Clear and unmistakable evidence demonstrates that rheumatic valvulitis preexisted active duty and clear and unmistakable evidence demonstrates that the disability was not aggravated by service; and no currently diagnosed heart disability is shown to be otherwise related to a disease, injury, or event in service.


CONCLUSION OF LAW

The criteria for establishing entitlement to service connection for a heart disability have not been met. 38 U.S.C.A. §§ 1101, 1110, 1111, 1131, 5103A, 5107 (West 2014); 38 C.F.R. §§ 3.102, 3.159, 3.303, 3.304, 3.306 (2015).


REASONS AND BASES FOR FINDING AND CONCLUSION

The Board has thoroughly reviewed all the evidence in the Veteran's claims file. Although the Board has an obligation to provide reasons and bases supporting this decision, there is no need to discuss, in detail, all the evidence submitted by or on behalf of the Veteran. See Gonzales v. West, 218 F.3d 1378, 1380-81 (Fed. Cir. 2000) (the Board must review the entire record, but does not have to discuss each piece of evidence). The analysis below focuses on the most salient and relevant evidence and on what this evidence shows, or fails to show, on the claim. The Veteran must not assume that the Board has overlooked pieces of evidence that are not explicitly discussed herein. See Timberlake v. Gober, 14 Vet. App. 122 (2000) (the law requires only that the Board address its reasons for rejecting evidence favorable to the Veteran).

Veterans Claims Assistance Act of 2000 (VCAA)

VA has met all statutory and regulatory notice and duty to assist provisions. See 38 U.S.C.A. §§ 5100, 5102, 5103, 5103A, 5106, 5107, 5126 (West 2014); 38 C.F.R. §§ 3.102, 3.156(a), 3.159, 3.326 (2015).

A VCAA letter dated in May 2009 fully satisfied the duty to notify provisions. See 38 U.S.C.A. § 5103(a) (West 2014); 38 C.F.R. § 3.159(b)(1) (2015). The letter informed him of the information or evidence that was needed to support his claim, and asked him to send the information or evidence to VA. The letter also explained to the Veteran how disability ratings and effective dates are determined. See Dingess/Hartman v. Nicholson, 19 Vet. App. 473 (2006).

With respect to the aforementioned Board hearing, the Court of Appeals for Veterans Claims held in Bryant v. Shinseki, 23 Vet. App. 488 (2010), that 38 C.F.R. 3.103(c)(2) requires that the Veterans Law Judge who conducts a hearing fulfill two duties to comply with the above the regulation. These duties consist of (1) the duty to fully explain the issues and (2) the duty to suggest the submission of evidence that may have been overlooked. Here, the VLJ noted the appellate issue at the beginning of the hearing, and asked questions to clarify the Veteran's contentions and treatment history. The Veteran provided testimony concerning the onset of a heart disability in service. Neither the Veteran nor his representative has asserted that VA failed to comply with 38 C.F.R. 3.103(c)(2), nor have they identified any prejudice in the conduct of the hearing. 

The Board also concludes VA's duty to assist has been satisfied. Copies of the Veteran's service treatment records and VA medical records are in the file. To the extent that the National Personnel Records Center indicated that "best possible copies" of the service treatment records were provided to VA as the originals were fire-related and moldy or brittle and could not be mailed, the Veteran was informed that he could supplement the available records with alternate sources of evidence. See June 2013 letter from the Appeals Management Center. In addition, pursuant to the Board's May 2013 remand, the Veteran's service personnel file was associated with the VBMS electronic claims file and medical records from 1980 to 1989 and from 2009 were added, to the extent available. As will be discussed in greater detail below, certain 1986 heart tests have been associated with the Veteran's claims file. 

The AMC contacted the appropriate VA facility and was told that no additional records for the period from 1980 to 1989 existed. The Veteran was advised that the records could not be obtained and that he should provide the records if they were in his possession or provide the location of the records. He was informed that he should respond as soon as he could otherwise a decision might be made after 10 days. See 38 C.F.R. § 3.159(e) (2015). In August 2013, the Veteran informed the AMC that he would fax records from the VA facility documenting his hospitalization in 1986; however, he provided another copy of the private calendar listing hospitalization that was already of record with handwritten notations of treatment in 1986. Thus, the Veteran clearly is aware that the only available record documenting his 1986 hospitalization for heart problems (other than the testing results already of record and discussed above) is his 1986 calendar with handwritten notes documenting treatment during that time period. Private medical records identified by the Veteran have been obtained, to the extent possible. In that regard, pursuant to the July 2015 Board remand, the Veteran was sent a letter in August 2015 requesting that he provide authorization to obtain medical records from a Dr. Yuviencho that he had previously identified or otherwise provide such records directly to VA. The Veteran did not respond to the letter. The Veteran has at no time otherwise referenced outstanding records that he wanted VA to obtain or that he felt were relevant to the claim. 

The duty to assist also includes providing a medical examination or obtaining a medical opinion when such is necessary to make a decision on the claim. 38 C.F.R. § 3.159(c)(4)(i) (2015). In that regard, the Veteran was afforded VA examinations in December 2009 and March 2015. The Board finds the reports to be thorough and complete. The opinions expressed were based on the Veteran's reported history and review of the claims file. The opinions were supported by a rationale. The Board concludes the opinions in this case are adequate upon which to base a decision. See Barr v. Nicholson, 21 Vet. App. 303, 312 (2007) (when VA undertakes to provide a VA examination or obtain a VA opinion, it must ensure that the examination or opinion is adequate).

Based on the association of the Veteran's personnel file, association and/or attempts to associate VA medical records, the March 2015 VA examination report, the August 2015 notice letter, and subsequent readjudication of the claim, the Board finds that there has been substantial compliance with its prior remand directives. See Stegall v. West, 11 Vet. App. 268, 271 (1998) (a remand by the Board confers upon the claimant, as a matter of law, the right to compliance with the remand instructions, and imposes upon the VA a concomitant duty to ensure compliance with the terms of the remand); see also D'Aries v. Peake, 22 Vet. App. 97, 105 (2008); Dyment v. West, 13 Vet. App. 141, 146-47 (1999).

As there is no indication that any failure on the part of VA to provide additional notice or assistance reasonably affects the outcome of this case, the Board finds that any such failure is harmless. See Mayfield v. Nicholson, 19 Vet. App. 103 (2005), rev'd on other grounds, Mayfield v. Nicholson, 444 F.3d 1328 (Fed. Cir. 2006).

Service Connection

Service connection may be established for disability resulting from personal injury suffered or disease contracted in the line of duty in the active military, naval, or air service. 38 U.S.C.A. §§ 1110, 1131 (West 2014). That an injury or disease occurred in service is not enough; there must be chronic disability resulting from that injury or disease. If there is no showing of a resulting chronic condition during service, then a showing of continuity of symptomatology after service is required to support a finding of chronicity. 38 C.F.R. § 3.303(b) (2015). Service connection may also be granted for any injury or disease diagnosed after discharge, when all the evidence, including that pertinent to service, establishes that the disease or injury was incurred in service. 38 C.F.R. § 3.303(d).

For veterans who have served 90 days or more of active service during a war period or after December 31, 1946, certain chronic disabilities, including cardio-vascular renal disease, are presumed to have been incurred in service if manifest to a compensable degree within one year of discharge from service. 38 U.S.C.A. §§ 1101, 1112, 1137 (West 2014); 38 C.F.R. §§ 3.307, 3.309 (2015). In the instant case, however, there is no presumed service connection because the evidence does not show that cardio-vascular renal disease was manifested to a compensable degree within one year of discharge from service. 

In the absence of the foregoing, to establish a right to compensation for a present disability on a direct basis, a Veteran must show: "(1) the existence of a present disability; (2) in-service incurrence or aggravation of a disease or injury; and (3) a causal relationship between the present disability and the disease or injury incurred or aggravated during service." Davidson v. Shinseki, 581 F.3d 1313, 1315-16 (Fed. Cir. 2009); Shedden v. Principi, 381 F.3d 1163, 1167 (Fed. Cir. 2004).

In this case, the Veteran contends that he never had heart problems prior to military service and that the onset of his heart problems occurred during his military service.

The Veteran's service treatment records include a normal examination of the heart in March 1952 prior to entrance into service. After entrance into service, an October 1952 routine chest examination for officer candidate school revealed a deformity of the eighth rib. A subsequent chest x-ray for heart size revealed rheumatic valvulitis, inactive. The specific radiographic findings were a slight thickening of the pleura in the left costophrenic angle with several small one millimeter foreign bodies in the left axilla. The left eighth rib was deformed in the axillary line, which was consistent with an old gunshot wound in the left axilla. The heart was within normal limits of size, shape, and position. A November 1952 examination at separation noted rheumatic valvulitis, inactive, with deformity of the mitral valve. A contemporaneous Report of Medical History noted a history of palpitation or pounding of the heart and shortness of breath. The Veteran reported that he was in good health, except for his heart. The medical provider noted at the bottom of the form that the Veteran had shortness of breath with exercise, which had been diagnosed as rheumatic valvulitis, inactive, with associated palpitation.

The Veteran's service personnel records include an Abstract of Clinical Records, which indicated that during a routine examination in October 1952, a systolic murmur was heard in the Veteran's heart. He denied a history of rheumatic fever or its components or a history of heart disease. The Veteran also denied a history of previous murmur or any current cardiac symptoms. On examination, there was no cardiac enlargement and heart tones were normal, but there was a soft, blowing systolic murmur in the mitral area that was fairly well transmitted to the axilla but not to the back. An electrocardiogram was within normal limits, but a chest x-ray showing deformity of the left eighth rib that was consistent with an old gunshot wound in the left axilla. The heart itself was within normal limits of size, shape, and position. After consultation with the Chief of the Medical Service, it was felt that the Veteran had rheumatic valvulitis, inactive, which preceded his entry into service and was not aggravated by his short tour of duty. It was recommended that the Veteran be medically separated from service. 

The Veteran contends that shortly after separation from service he went to a private medical professional who advised him to stop playing basketball, but otherwise prescribed no medication or other treatment. The Veteran claims that he was not treated again for his heart until the 1980s when he had hernia surgery at VA, which records have been found to be partially unavailable. That said, the results of certain electrocardiograms (ECGs) have been associated with the claims file. The initial ECG, from February 1986 included initial findings of "Nonspecific intraventricular conduction delay" and a "Borderline ECG." Two days later, the Veteran had "minor nonspecific ST CHANGES." The following day, the Veteran had "Sinus tachycardia with frequent Premature ventricular complexes," "ST-T WAVE CHANGES, LEAD 1, AND L MORE PRO[M]INENT THAN BEFORE," and an "Abnormal ECG." The following day, the records noted "Prolonged QT interval or tu fusion, consider myocardial disease, electrolyte imbalance, or drug effects." In addition, the "ST & T WAVE CHANGES ARE Less prominent since [the previous day.]" The next few days included findings of a "Borderline ECG," "Nonspecific intraventricular conduction delay" and/or "Nonspecific T changes." 

The Veteran's post-service VA treatment records include an August 2002 treatment record noting the Veteran's report of a bout of atrial fibrillation four years previously, but on examination there was no angina, no palpitations, no gallops, and no rubs. The Veteran was noted to be taking Lanoxin (Digoxin) and Lopressor (Metoprolol). The assessment was that the Veteran was in normal sinus rhythm, but with a prior bout of atrial fibrillation. Another August 2002 treatment record included the Veteran's reports of a past medical history of heart disease and rheumatic fever as a child. A March 2009 VA treatment record noted a remote history of atrial fibrillation, but the Veteran's heart was regular and without murmur on examination. 

The Veteran was afforded a VA examination in December 2009. The examiner noted review of the claims file and medical records. The Veteran reported that during hospitalization at the VA in 1986 for hernia surgery that he had a "heart attack." The follow-up was ok and he had not been back to VA since 2000. His only current heart-related problem was hypertension, but he did continue to take Digoxin. The examiner noted an in-service chest x-ray showing that the heart was within normal limits, but diagnosing rheumatic valvulitis, inactive, and that the Veteran subsequently separated from service for rheumatic valvulitis inactive with associated palpitation. The Veteran was diagnosed with hypertension in January 2000 and was treated with Digoxin and Metoprolol. On examination, there was no evidence of congestive heart failure or pulmonary hypertension. Following diagnostic testing, the examiner concluded that there were no objective findings of valvular disease related to rheumatic heart disease. The diagnoses, however, were hypertension, trivial mitral regurgitation, and mild pulmonary hypertension based on echocardiogram findings. The examiner concluded that it was less likely than not that the Veteran's history of atrial fibrillation was caused by or a result of rheumatic heart disease noted in service. The rationale was that the report of atrial fibrillation in 1986 was not documented in the medical records, other than the Veteran's prescription of Digoxin for his heart. Review of the medical records from 1999 to 2002 did not include a diagnosis of any heart condition. The diagnosed hypertension, mitral valve regurgitation, and pulmonary hypertension were not caused by rheumatic heart disease from 1952, as current objective findings showed no evidence of a heart condition related to rheumatic heart disease.

The Veteran's August 2010 substantive appeal included his statement that he had experienced no problems with his heart prior to service and had been very active. He was given a clean bill of health on entrance into service and it was only after some time in service that he was notified he had a heart problem. Over the years the heart problems had gradually worsened.

A July 2011 VA treatment record indicated that the Veteran had experienced a remote bout of atrial fibrillation that had not reoccurred since starting Digoxin / Metoprolol.

The Veteran suggested during his April 2013 Board hearing that one of the medical professionals in service told him that his heart problems had started in service.

The Veteran was afforded a VA examination in March 2015. The examiner stated that there was no current objective evidence of rheumatic valvulitis or other heart condition. Following an interview of the Veteran, an extensive discussion of the Veteran's in-service and post-service medical records, and a physical examination, the VA examining physician concluded that there was clear and unmistakable evidence that the Veteran's rheumatic valvulitis existed prior to his military service and that there was clear and unmistakable evidence that it was not aggravated by service. As to the rationale that the rheumatic valvulitis existed prior to service, the examiner specifically noted that in October 1952 the heart was of normal size, shape, and position and that the Veteran's rheumatic valvulitis was found to have preexisted service at the time of his separation from service. In addition, the November 1952 examination at separation found the rheumatic valvulitis to be inactive. Finally, the examiner concluded, "Medical literature supports that acute rheumatic valvulitis is associated with migratory arthritis, erythema marginatum, Sydenham's chorea, subcutaneous nodules, arthralgia, fever. There is no documentation of any of the above and thus the veteran's valvulitis was noted as inactive. Medical literature supports that 'inactive' rheumatic valvulitis occurs years after acute valvulitis and cannot occur in the 3 months and 11 days time frame of the veteran's active military service." 

As to whether the rheumatic valvulitis was permanently aggravated by service, the examiner explained, "There is no documentation to support that the veteran was being treated for the claimed heart condition after service. There is no documentation of a diagnosis of a rheumatic valvulitis condition in the veteran's post service treatment records. The veteran was able to maintain gainful employment after service and stopped working in 1995 due to non medical reasons." 

The examiner also concluded that the Veteran did not have a heart disability that was incurred in or aggravated by service. The examiner noted that there was no documentation that the Veteran had been diagnosed with rheumatic valvulitis or other heart condition after service. "The veteran's 2 D Echo noted in 2009 is essentially normal with only trivial mitral regurgitation. Medical literature supports that trivial mitral regurgitation is an [sic] commonly found in many normal hearts. The veteran's chest xray in 2009 shows normal heart size and contour. There is a history of 'remote atrial fibrillation' reported by the veteran when he re established with the VA in 2002. However there is no documentation in the veteran's medical record to support this. The veteran's several EKGs reviewed do not show any evidence of atrial fibrillation."

Every veteran shall be taken to have been in sound condition when examined, accepted, and enrolled for service, except as to defects, infirmities, or disorders noted at the time of the examination, acceptance, and enrollment, or where clear and unmistakable evidence demonstrates that the injury or disease existed before acceptance and enrollment and was not aggravated by such service. 38 U.S.C.A. § 1111 (West 2014).

In order to rebut the presumption of soundness at service entry, there must be clear and unmistakable evidence showing that the disorder preexisted service and there must be clear and unmistakable evidence that the disorder was not aggravated by service. The Veteran is not required to show that the disease or injury increased in severity during service before VA's duty under the second prong of this rebuttal standard attaches. VAOPGPREC 3-2003 (July 16, 2003); Jordan v. Principi, 17 Vet. App. 261 (2003); Wagner v. Principi, 370 F.3d 1089 (Fed. Cir. 2004).

However, where a preexisting disease or injury is noted on the entrance examination, section 1153 of the statute provides that "[a] preexisting injury or disease will be considered to have been aggravated by active military, naval, or air service, where there is an increase in disability during such service, unless there is a specific finding that the increase in disability is due to the natural progress of the disease." 38 U.S.C.A. § 1153 (West 2014); 38 C.F.R. § 3.306(a) (2015). 

For Veterans who served during a period of war or after December 31, 1946, clear and unmistakable evidence is required to rebut the presumption of aggravation where the preservice disability underwent an increase in severity during service, and clear and unmistakable evidence includes medical facts and principles which may be considered to determine whether the increase is due to the natural progress of the condition. 38 C.F.R. § 3.306(b). Temporary or intermittent flare-ups of a preexisting injury or disease are not sufficient to be considered "aggravation in service" unless the underlying condition itself, as contrasted with mere symptoms, has worsened. See Jensen v. Brown, 4 Vet. App. 304, 306-07 (1993); Green v. Derwinski, 1 Vet. App. 320, 323 (1991); Hunt v. Derwinski, 1 Vet. App. 292, 297 (1991).

The joint motion for remand found that remand was warranted for the Board to provide an adequate statement of reasons and bases, specifically with regard to the doctrine of presumption of soundness. It was noted that there was evidence indicating that the Veteran was diagnosed with rheumatic valvulitis in service and that the Chief of Medical Service indicated that it preceded his entry into service. The Board did not adequately address whether this evidence qualifies as "clear and unmistakable evidence that demonstrated that the disease existed before acceptance and enrollment," as contemplated by 38 U.S.C.A. § 1111, and, if it is, whether clear and unmistakable evidence exists that indicates that the condition was not aggravated by military service. 

The Veteran's service treatment records include a March 1952 induction examination that included normal findings as to the heart. Moreover, no specific medical examination was conducted precisely contemporaneous with the Veteran's formal entry into service in August 1952. Thus, the Veteran is presumed to have entered service in sound condition. See Bagby v. Derwinski, 1 Vet. App. 225, 227 (1991). As noted, however, the presumption can be rebutted by clear and unmistakable evidence.

In this case, the evidence of record clearly and unmistakably establishes that rheumatic valvulitis preexisted military service. In October 1952, after consultation with the Chief of the Medical Service, military medical professionals concluded that the Veteran had rheumatic valvulitis, inactive, which preceded his entry into service and was not aggravated by his short tour of duty. It was recommended that the Veteran be medically separated from service. 

Also, a March 2015 VA medical examination report included the VA examining physician's conclusion that there was clear and unmistakable evidence that the Veteran's rheumatic valvulitis existed prior to his military service. In reaching that conclusion, the examiner extensively discussed the Veteran's in-service and post-service medical records and his overall contentions. The examiner specifically noted that the Veteran's rheumatic valvulitis was found to have preexisted service at the time of his separation from service. In addition, the November 1952 examination at separation found the rheumatic valvulitis to be inactive. Finally, the examiner concluded, "Medical literature supports that acute rheumatic valvulitis is associated with migratory arthritis, erythema marginatum, Sydenham's chorea, subcutaneous nodules, arthralgia, fever. There is no documentation of any of the above and thus the veteran's valvulitis was noted as inactive. Medical literature supports that 'inactive' rheumatic valvulitis occurs years after acute valvulitis and cannot occur in the 3 months and 11 days time frame of the veteran's active military service."

Thus, both contemporaneous and current medical opinions have unequivocally concluded that the Veteran's rheumatic valvulitis, diagnosed in October 1952 during service, preexisted service. 

The Board acknowledges the Veteran's contentions that he did not experience heart problems prior to his entry into service. The Veteran certainly is competent to report the absence of any heart symptoms prior to service, but such assertions do not address whether a heart disability existed prior to his military service. As to any implicit or explicit contentions of the Veteran that his rheumatic valvulitis had its onset during service, the Board finds that given the complexity of diagnosing rheumatic valvulitis that such contentions fall outside the realm of common knowledge of a layperson and are of no probative value. See Jandreau v. Nicholson, 492 F.3d 1372, 1377 (Fed. Cir. 2007) (explaining in footnote 4 that a veteran is competent to provide a diagnosis of a simple condition such as a broken leg, but not competent to provide evidence as to more complex medical questions); cf. Kahana v. Shinseki, 24 Vet. App. 428, 435 (2011).

In summary, given the consistent medical evidence concluding that the rheumatic valvulitis diagnosed in October 1952 preexisted service and the absence of any competent evidence to the contrary, the Board finds that there is clear and unmistakable evidence of record that his rheumatic valvulitis preexisted service. See Doran v. Brown, 6 Vet. App. 283, 286 (1994).

The Board notes that the presumption of soundness on entrance cannot be overcome simply based on the representations of the Veteran of a vague past history during the entrance examination or thereafter. See Miller v. West, 11 Vet. App. 345, 348 (1998) (holding that a veteran's self-report that he had previously suffered from "depression or excessive worry" prior to service was insufficient to rebut the presumption of soundness as was found in 38 U.S.C.A § 1111); see also Crowe v. Brown, 7 Vet. App. 238, 246 (1995). In this case, however, as discussed above there is medical evidence supported by a rationale which clearly and unmistakably shows that the disorder preexisted service.

As set forth in VAOPGCPREC 3-2003, the Board must also determine if there is clear and unmistakable evidence that the disorder was not aggravated during service.

In this case, there is clear and unmistakable evidence establishing that the Veteran's rheumatic valvulitis was not aggravated by service beyond the natural progression of the disease. In that regard, the examiner unequivocally found that despite the in-service evidence of shortness of breath on exertion, there was clear and unmistakable evidence that the rheumatic valvulitis was not permanently aggravated by service. The examiner noted the Veteran's contentions, but found that there was no documentation to support that he had been treated for rheumatic valvulitis after service. There also was no documentation of a diagnosis of rheumatic valvulitis in the Veteran's medical records after service nor was such found on examination. Finally, the Veteran was able to maintain gainful employment after service and stopped working in 1995 due to non medical reasons. The Board finds it extremely significant that despite separate VA examinations in December 2009 and March 2015, as well as additional treatment records in the claims file, there is no evidence of a diagnosis of rheumatic valvulitis after service. 

As noted above, the underlying disorder, as opposed to the symptoms, must be shown to have worsened in order to find aggravation. In this case, while the Veteran did report shortness of breath and ultimately was diagnosed with rheumatic valvulitis in service, the March 2015 VA examiner persuasively explained how the medical findings at that time and the nature of rheumatic valvulitis made it clear and unmistakable that the rheumatic valvulitis was inactive and not aggravated during service. Moreover, multiple medical professionals have examined the Veteran's heart, but have not diagnosed or otherwise found evidence of current rheumatic valvulitis. Thus, the evidence of record clearly and unmistakably shows that a permanent aggravation of a preexisting rheumatic valvulitis disability did not occur. See Jensen, 4 Vet. App. at 306-07; Green, 1 Vet. App. at 323; Hunt, 1 Vet. App. at 297.

Thus, the only evidence that the Veteran's rheumatic valvulitis and associated problems began in or were otherwise permanently aggravated by service is the Veteran's own lay assertions. To the extent that the Veteran contends such symptoms permanently worsened due to service, the Board does not find such representations of any probative value in light of the Veteran's lack of medical training and expertise and the complexity of attributing any observed symptomatology to a specific heart disorder or to the permanent aggravation of that disorder. See Jandreau, 492 F.3d at 1377. Also significant is the lack of a currently diagnosed heart disability.

Therefore, in summary, the Board finds that the credible and probative evidence of record clearly and unmistakably shows that the Veteran's rheumatic valvulitis preexisted service and was not aggravated therein. For this reason, the Board finds that service connection for rheumatic valvulitis is denied.

As to any other heart or related disability, the evidence of record does not establish that such disability preexisted military service, had its onset in service or within one year of separation from service, or is otherwise related to service. Indeed, the March 2015 VA examiner specifically concluded that the Veteran did not have any current heart disability.

In order to warrant service connection, the threshold requirement is competent medical evidence of the existence of the claimed disability at some point during a veteran's appeal. See McClain v. Nicholson, 21 Vet. App. 319 (2007) (requirement that a current disability be present is satisfied "when a claimant has a disability at the time a claim for VA disability compensation is filed or during the pendency of that claim...even though the disability resolves prior to the Secretary's adjudication of the claim"); Degmetich v. Brown, 104 F.3d 1328 (1997); Brammer v. Derwinski, 3 Vet. App. 223 (1992). As to the Veteran's claimed atrial fibrillation, the Board recognizes that the Veteran has a reported history of atrial fibrillation, but the December 2009 and March 2015 VA examiners found no evidence in the record to support a diagnosis of atrial fibrillation and no medical records during the claim period, or in proximity thereto, include a current diagnosis of atrial fibrillation. The December 2009 VA examiner discussed the confusion in the records from 1999 to 2002, when the Veteran was prescribed heart medication, but that there was no evidence of atrial fibrillation diagnosed at that time. In addition, the March 2015 VA examination report noted the documentation of "remote atrial fibrillation," but observed that the medical records did not support this finding and noted that several EKG results of record did not show any evidence of atrial fibrillation. In light of the foregoing, the Board finds that the preponderance of the record is against finding that the Veteran has a diagnosis of atrial fibrillation at any time during the claim period or in proximity thereto. 

The Board also has considered the findings of the December 2009 VA examination report diagnosing hypertension, mitral valve regurgitation, and pulmonary hypertension. That said, the examiner also concluded that these disabilities were not caused by rheumatic heart disease from 1952, as the objective findings from diagnostic testing showed no heart condition related to rheumatic heart disease. Although not explicitly stated, the clear intent of the examiner was to opine that the current heart problems were unrelated to any incident of service, including the diagnosed rheumatic valvulitis. See Monzingo v. Shinseki, 26 Vet. App. 97, 106 (2012) (a medical report must be read as a whole in the context of the claim and, even an opinion lacking in detail may be provided some probative value based upon the amount of information and analysis contained therein) (citing Acevedo v. Shinseki, 25 Vet. App. 286, 293-294 (2012) (noting that the law imposes no reasons-or-bases requirement on examiners)). 

The March 2015 VA examination report also addressed the Veteran's documented mitral valve regurgitation, concluding that it was less likely than not related to military service. The examiner stated that the mitral regurgitation seen in 2009 was trivial and that it was commonly found in many normal hearts. While the examiner did note that echocardiogram in December 2009 showed evidence of mild LVH, he also noted that such was due to hypertension. Ultimately, the examiner determined that there was no current objective evidence of rheumatic valvulitis or other heart condition. With regard to hypertension, the Board notes that there is no assertion or indication in the record that hypertension may have been incurred in service. 

In light of the foregoing, the Board finds the December 2009 and March 2015 VA medical examination reports to be the most probative evidence of record with respect to the etiology and/or existence of the above disorders.

The Board has considered the Veteran's assertions that his current heart problems are due to his military service. Certainly, the Veteran can attest to factual matters of which he has first-hand knowledge, such as subjective complaints of heart palpitations and shortness of breath, and his assertions in that regard are entitled to some probative weight. See Washington v. Nicholson, 19 Vet. App. 362, 368 (2005). Although lay persons are competent to provide opinions on some medical issues, see Kahana, 24 Vet. App. at 435, as to the specific issue in this case, determining the diagnosis and etiology of heart problems that were first discussed multiple years after separation from service and attempting to link such problems to a wholly separate heart condition noted in service, but not present currently, falls outside the realm of common knowledge of a lay person. See Jandreau, 492 F.3d at 1377; see also Layno v. Brown, 6 Vet. App. 465 (1994) (cautioning that lay testimony that the Veteran suffered a particular illness (bronchial asthma) was not competent evidence because matter required medical expertise). 

Finally, the Board has considered the Veteran's representations that one or more medical professionals have told him that his current heart problems were incurred in military service. Even assuming the accuracy of these representations, in the absence of any stated rationale for the opinions expressed or indication as to the basis or bases of the conclusions, the Board affords far greater probative weight to the well-reasoned and supported conclusions expressed in the VA medical examination reports of record.

In summary, the credible and probative evidence of record clearly and unmistakably establishes both that the Veteran's rheumatic valvulitis diagnosed in October 1952 preexisted service and was not aggravated by service. Furthermore, the preponderance of the evidence also shows that any other current heart or related disability is not related to his military service. Thus, the Board finds that the benefit of the doubt doctrine is not for application, and that the claim must be denied. See generally Gilbert v. Derwinski, 1 Vet. App. 49 (1990); Ortiz v. Principi, 274 F.3d 1361 (Fed Cir. 2001).


ORDER

Entitlement to service connection for a heart disability is denied.



____________________________________________
S. S. TOTH
Veterans Law Judge, Board of Veterans' Appeals


Department of Veterans Affairs